UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK A. LAPOINTE and
BECKY LAPOINTE,

                Counter-Plaintiffs,

v.

CSX TRANSPORTATION, INC.,

                Counter-Defendant.
_____/

Case No. 15-11575

Paul D. Borman
United States District Judge

Mona K. Majzoub
United States Magistrate Judge

## **OPINION AND ORDER DENYING COUNTER-DEFENDANT'S MOTION TO DISMISS**

Counter-Plaintiff Mark LaPointe was driving a tractor-trailer truck when he arrived at a two-track perpendicular railroad crossing owned and operated by Counter-Defendant CSX Transportation, Inc. ("**CSX**"). At least one of the crossing gates was down and a train idled on the nearer track, partially blocking the view of the track next to it. After a few minutes during which the vehicles ahead of LaPointe drove around the gates and across the tracks one by one, LaPointe followed suit. As he crossed the tracks he was hit by an oncoming train that had been obscured from view by the stationary train, and suffered grievous injuries as a result. The accident also caused property damage to CSX. This lawsuit was initiated by CSX suing LaPointe and others to recover for its damages. LaPointe countersued with a negligence claim (along with his wife Becky, who asserts a derivative loss of

consortium claim). All other claims except for those asserted by Mark and Becky LaPointe (collectively "**Counter-Plaintiffs**") have dropped out of the action.

CSX now moves to dismiss the action for failure to state a claim. Owing to a significant ambiguity in Counter-Plaintiffs' allegations regarding the activation of the crossing gates, however, the Court will deny CSX's Motion to Dismiss.

## I. BACKGROUND

### A. Counter-Plaintiffs' Factual Allegations

On November 24, 2013, Counter-Plaintiff Mark A. LaPointe ("**LaPointe**") was driving a tractor-trailer truck eastbound on County Road 151 in Monroe County, Michigan, when he arrived at a multi-track railroad crossing owned and operated by CSX. The railroad tracks were roughly perpendicular to the road. At the crossing, a train was idling on the southbound track (the track closer to LaPointe), and part of the train protruded into the crossing. The protruding part of the train thus obstructed the road's path through the crossing, and the rest of the train blocked any view to the south of the adjacent track. (ECF No. 54, Am. Counter-Compl. ¶ 4.)

At least one gate of the crossing was down; the parties disagree as to the second gate. There were no flaggers or other railroad personnel at the crossing, and Counter-Plaintiffs allege on information and belief that the train on the southbound track had been idling in the same position for hours. There was no moving train traffic on either track while LaPointe waited at the crossing for over five minutes,

during which time several vehicles in front of him traveled successfully through the crossing. (Am. Counter-Compl. ¶ 4.) When LaPointe himself entered the crossing and maneuvered past the idling train, he was unexpectedly struck by a northbound train. (Am. Counter-Compl. ¶ 7.) Counter-Plaintiffs contend that the northbound train either failed to sound its horn as it went through the crossing, or sounded a horn that was drowned out by the sound of the idling southbound train. (Am. Counter-Compl. ¶¶ 9-10.) LaPointe was severely injured as a result of the collision, and his injuries included a traumatic brain injury, injuries to his hip and shoulder that each required surgery, a serious and prolonged infection, and other physical and psychological pain including post-traumatic stress. (Am. Counter-Compl. ¶ 15.) His wife Becky also seeks damages for loss of consortium.

Counter-Plaintiffs allege that CSX has consistently left its trains idling near and protruding into this crossing with the gates down, and that LaPointe himself "had passed through this crossing on countless occasions previously and knew that the operation of the crossing [gates and signals] was unreliable." (Am. Counter-Compl. ¶¶ 6, 9.) Counter-Plaintiffs further allege that CSX violated its own safety rules by leaving the southbound train protruding into the crossing such that it obstructed motorists' view of the adjacent track, and by failing to deploy a flagman at the crossing to warn motorists and direct traffic. (Am. Counter-Compl. ¶ 5.)

B.  **Procedural History**

This lawsuit was originally filed on May 1, 2015 by CSX against various parties including LaPointe, the owners of the truck he was driving, and an insurance company that had insured the other defendants. (ECF No. 1.) Jurisdiction was predicated on the complete diversity of the parties. (*See id.* ¶ 13.) On December 30, 2015, this Court entered an Opinion and Order dismissing some of the claims and defendants, and granting CSX leave to file an amended complaint, which CSX did on January 15, 2017. (ECF Nos. 27, 28.) Two weeks later, Mark and Becky LaPointe (Counter-Plaintiffs here) filed a Counter-Complaint in which they first asserted the claims against CSX that are now the target of CSX's Motion to Dismiss: one count of negligence and one derivative count of loss of consortium. (ECF No. 30.)

On January 13, 2017, CSX dropped all remaining claims except for one claim against LaPointe (ECF No. 40), leaving only that claim and Counter-Plaintiffs' counter-claims against CSX still in the action. One month later, Counter-Plaintiffs moved for leave to amend their counter-complaint based on information they had obtained since they first filed it. (ECF No. 42.) The proposed changes to their allegations specifically concerned the crossing gates. Counter-Plaintiffs' original counter-complaint alleged that "the crossing gates and warning signals located at the crossing were not activated" at the time of the accident. (ECF No. 30 ¶ 5.) But, Counter-Plaintiffs stated in their motion for leave to amend, further investigation

tended to show that the east gate—the gate on the other side of the crossing from where LaPointe approached it—was lowered. (ECF No. 42 at 2-3, Pg ID 372-73.)

Counter-Plaintiffs' motion for leave to amend was referred to Magistrate Judge Mona K. Majzoub on February 14, 2017. (ECF No. 44.) Shortly thereafter, CSX dropped its last claim against LaPointe (ECF Nos. 50-51), at which point only Counter-Plaintiffs' claims against CSX were left.

CSX opposed Counter-Plaintiffs' motion for leave to amend on the basis of futility (ECF No. 47), but the Magistrate Judge determined that Counter-Plaintiffs' proposed counter-complaint did not fail to state a claim on its face, and granted their motion for leave to amend (ECF No. 53). Counter-Plaintiffs filed their Amended Counter-Complaint on July 25, 2017 (ECF No. 54. Am. Counter-Compl.), and CSX filed the instant Motion to Dismiss eight days later (ECF No. 55, Def.'s Mot.). Counter-Plaintiffs filed a timely Response (ECF No. 58, Pls.' Resp.), and CSX filed a timely Reply (ECF No. 60, Def.'s Reply.)

This Court conducted a hearing on CSX's Motion to Dismiss on Thursday, October 26, 2017, and now issues the following ruling.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the

complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted).

In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has recently reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.      ANALYSIS

### A.     Negligence (Count I)

Michigan law governs the substantive components of this diversity action. "A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits. And a federal court in a diversity action is obligated to apply the law it believes the highest court of the state would apply if it were faced with the issue." *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017) (internal quotation marks and citations omitted). "In a tort action, Michigan courts recognize a presumption in favor of *lex fori* and apply Michigan law 'unless a "rational reason" to do otherwise exists.'" *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013) (quoting *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286 (1997)). The "rational reason" inquiry begins with a determination as to whether "any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* As Counter-Plaintiffs are Michigan citizens, the collision occurred in Michigan, and the parties have consistently cited Michigan law throughout the litigation thus far, this Court sees no grounds for concluding that any other state has an interest in having its law applied.

To establish a prima facie case of negligence under Michigan law, "a plaintiff must prove that '(1) the defendant owed the plaintiff a legal duty, (2) the defendant

breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages.'" *Hill v. Sears, Roebuck & Co.*, 492 Mich. 651, 660 (2012) (quoting *Loweke v. Ann Arbor Ceiling & Partition Co.*, L.L.C., 489 Mich. 157, 162 (2011)). At the pleading stage, "[a] cause of action for negligence must include allegations to support each of [the] four elements" of duty, breach, damages, and proximate causation. *Diem v. Sallie Mae Home Loans, Inc.*, 307 Mich. App. 204, 214 (2014) (citing *Loweke v. Ann Arbor Ceiling & Partition Co., LLC*, 489 Mich. 157, 162 (2011)). "The question whether a defendant has breached a duty of care is ordinarily a question of fact for the jury . . . ." *Latham by Perry v. Nat'l Car Rental Sys., Inc.*, 239 Mich. App. 330, 340, 608 N.W.2d 66, 72 (2000) (citing *Spikes v. Banks,* 231 Mich. App. 341, 355 (1998)).

Counter-Plaintiffs assert various theories of negligence in their Amended Counter-Complaint. Chief among them is the theory that CSX was negligent in its failure to warn LaPointe that the northbound track was active and the presence of a train on it was imminent, despite the fact that the train on the southbound track was allowed to remain stationary so as to obscure eastbound motorists' view to the south. In connection with this theory, Counter-Plaintiffs claim that CSX negligently failed to "maintain the crossing gates . . . in proper working order;" that CSX negligently failed to "require a flagman at the . . . crossing to warn east and west bound motor vehicle traffic that the northbound track was active;" or that the northbound train

negligently "failed to sound its horn when entering the crossing in violation of applicable federal regulations and railroad orders." (Am. Counter-Compl. ¶ 13(d)-(f).)

CSX separately addresses each of Counter-Plaintiffs' theories of negligence in its Motion to Dismiss. Regarding Counter-Plaintiffs' theory that the crossing gates were not kept in working order, CSX argues that Counter-Plaintiffs' own allegation that the east gate was down is fatal to their theory that the gates were not in working order. The gates are designed to be lowered when a train is at or near the crossing, CSX contends, and at all times relevant to the allegations in the Amended Counter-Complaint, both of these were the case: the east gate was down, and a train was approaching on the easternmost track. Any subjective belief on LaPointe's part that the gates were malfunctioning, then, was unreasonable given that the east gate was activated. CSX also points out that the Michigan Vehicle Code requires any "person driving a vehicle [who] approaches a railroad grade crossing" when "[a] crossing gate is lowered" to "stop the vehicle not more than 50 feet but not less than 15 feet from the nearest rail of the railroad, and . . . not proceed until the driver can do so safely . . . ." Mich. Comp. Laws § 257.667(1). The statute further provides that any person who fails to do this, or who "drive[s] a vehicle through, around, or under a crossing gate or barrier at a railroad crossing while the gate or barrier is closed or is being opened or closed," is "responsible for a civil infraction." *Id.* § 257.667(2)-(3).

9

What these arguments fail to account for, however, is that the Amended Counter-Complaint is silent on whether the west gate was lowered in addition to the east gate, and this omission significantly undermines CSX's argument that it discharged any duty of warning that it had by activating the gates at the crossing. If the west gate was not lowered despite the fact that a stationary train was on the southbound track, then the gates (plural) would not have been fully serving their intended purpose as warning signals, and this would have rendered a belief on LaPointe's part that the gates were malfunctioning more reasonable under the circumstances. This factual gap will benefit from discovery. Consequently, the Court declines to find that the Amended Counter-Complaint fails as a matter of law to state a negligence claim based on the theory that the crossing gates malfunctioned.

Moreover, to whatever extent LaPointe did violate Mich. Comp. Laws § 257.667 by entering the crossing, this goes to the question of comparative fault, which is an issue for the trier of fact. *See* Mich. Comp. Laws § 600.6304(1) (providing that the fact-finder in certain categories of tort actions shall make findings indicating the "percentage of the total fault of all persons that contributed to the death or injury").[1] CSX characterizes its arguments regarding Mich. Comp. Laws §

---

[1] Courts within this District have commonly regarded this provision as applicable in tort actions governed by Michigan law. *See, e.g., Redmond v. United States*, 194 F. Supp. 3d 606, 623-24 (E.D. Mich. 2016); *K.S. v. Detroit Pub. Sch.*, 153 F. Supp. 3d 970, 979-80 (E.D. Mich. 2015); *Sedgwick Ins. v. F.A.B.E. Custom Downstream*

257.667 as directed towards the presence or absence of essential elements in Counter-Plaintiffs' case rather than comparative fault. But given that the ambiguity regarding the activation of the west gate at the crossing undermines CSX's argument that Counter-Plaintiffs have failed to plead the elements of their case, as explained above, the only clear relevance of Mich. Comp. Laws § 257.667 at this time is to comparative fault.

Because the gap in Counter-Plaintiffs' allegations regarding the activation of the west gate precludes dismissal of the Amended Counter-Complaint for failure to state a claim, this Court will deny CSX's Motion to Dismiss as to Counter-Plaintiffs' negligence claim.

**B.     Loss of Consortium (Count II)**

"The derivative claim of loss of consortium stands or falls on the primary claims in the complaint." *Kohler v. N. Star Steel Co.*, 408 F. Supp. 2d 380, 386–87 (E.D. Mich. 2005) (internal quotation marks omitted) (quoting *Loper v. Computer Network Technology Corp.*, 128 F. Supp. 2d 1061, 1069 (E.D. Mich. 2001) and *Long v. Chelsea Community Hospital*, 219 Mich. App. 578 (1996)); *see also Grain v. Trinity Health*, 431 F. App'x 434, 454 (6th Cir. 2011) ("Under Michigan law, a claim for a loss of consortium 'does not arise at all unless the other, impaired spouse has

---

*Sys., Inc.*, 47 F. Supp. 3d 536, 538-42 (E.D. Mich. 2014). This Court assumes for the purposes of the instant Motion that it would apply in this case as well.

sustained some legally cognizable harm or injury.'") (quoting *Eide v. Kelsey–Hayes Co.*, 431 Mich. 26, 29 (1988)).

As Counter-Plaintiffs' negligence claim survives CSX's Motion to Dismiss, their loss of consortium claim does as well.

## IV. CONCLUSION

For the above reasons, the Court hereby DENIES CSX's Motion to Dismiss.

IT IS SO ORDERED.

s/Paul D. Borman<br>
Paul D. Borman<br>
United States District Judge

Dated: November 6, 2017

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 6, 2017.

s/D. Tofil<br>
Deborah Tofil, Case Manager